UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEVEN GUARINO, <br><br> Plaintiff, <br><br> v. <br><br> ROOMS.COM, INC. n/k/a WORLD TRAVEL HOLDINGS, HOTEL DISTRIBUTION NETWORK; PHOTIOS COUGENTAKIS a/k/a FRANK COUGENTAKIS, ADRIAN COPPIETERS, and GEORGE DEMAKOS, <br><br> Defendants. | CASE NO. 07-cv-11618 <br><br><br> COMPLAINT <br><br><br> DEMAND FOR JURY TRIAL |

## STATEMENT OF FACTS

### The Parties

1.      Plaintiff, Steven Guarino, ("Plaintiff" or "Guarino") is an adult individual residing at 3 Downe Circle, Medford, New Jersey.

2.      Defendant Rooms.com, Inc. n/k/a World Travel Holdings, Inc. ("Rooms.com") is a Delaware Corporation.  Rooms.com incorporated in September 2003 and on information and belief, changed its name to World Travel Holdings, Inc. in January 2005.  The principal offices of the internet based travel booking network located at 445 Broadhollow Road, Suite 420B, Melville, New York, 11747.

3.      Defendant Hotel Distribution Network Corporation ("HDN") is the predecessor company of Rooms.com.  HDN was a privately-held Florida corporation operated by its directors, defendants Adrian Coppieter, George Demakos, and Photios Cougentakis a/k/a Frank Cougentakis.  The company was a travel distributor with offices

in Melville, New York; Florida, Pennsylvania and Brazil.  The company focused on providing travel destinations to both North Americans and Brazilians.  The principal place of business for HDN was located at 121 East 1st Street, Sanford Florida 32771  On information and belief, HDN continues to exist as of the date of this complaint.  The website www.hdn.com is still active and advertises "Hotel Discounts Network," a predecessor name for HDN.

4.      Defendant Photios Cougentakis a/ka Frank Cougentakis ("Cougentakis") is an adult individual with a business address of 10 Harbor Park Drive, Port Washington, New York, 11050.  On information and belief, Cougentakis was a principal, shareholder and director of defendant WTH.  On information and belief, Cougentakis incorporated Rooms.com in October 2003.  Cougentakis is the controlling shareholder, director and principal of Rooms.com.  On or about January 23, 2004, Cougentakis, as an alleged creditor of HDN, foreclosed on all of HDN's assets.

5.      Defendant Adrian Coppieters ("Coppieters") is an adult individual with a business address of 15 W 44th St, New York, NY 10036-6611.  Defendant Coppieters was Chairman, CEO and a director of Defendant HDN.  On information and belief, Coppieters is Chairman and CEO of Travel Trade, a travel publication serving the travel agent industry.

6.      Defendant George Demakos ("Demakos") is an adult individual with a business address of W 44th St, New York, NY 10036-6611.  Demakos was the President and a director of defendant HDN.  On information and belief, Demakos is President of Travel Trade, a travel publication serving the travel agent industry.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C.

§1332(a)(2), because complete diversity exists between the Plaintiff and each Defendant,

and the amount in controversy exceeds $75,000.00.  This action is not a collusive action

designed to confer jurisdiction on a court of the United States that it would not otherwise

have.

8.      This Court has supplemental jurisdiction over the pendant state law

claims asserted herein pursuant to 28 U.S.C. § 1367(a) and over all other claims where,

as here, they are so related to claims in the action within the original jurisdiction of this

Court that they form part of the same case or controversy under Article III of the United

States Constitution.

9.      Venue is proper in this District pursuant to 28 U.S.C. §1391 because

Defendant Rooms.com conducts business and maintains operations and has a principal

place of business in this District.  Additionally, individual defendants George Demakos,

Photios Cougentakis and Adrian Coppieters reside or have business addresses in this

District.

## Background

10.     Hotel Discounts Network, Corp. was incorporated in the State of Florida

on August 31, 1999. At that time, Hotel Discounts Network Corp. issued 100 shares of

stock ($10.00 each share) and named one director – Rosana F. Texeira.

11.     HDN sought to compete in the online travel reservation industry.  HDN

would generate revenue by purchasing hotel room reservations at a discount, mark up that

price to consumers who would purchase the rooms through HDN.

11.    On July 27, 2000, Hotel Discounts Network Corp. amended its articles of incorporation to authorize the company to issue 10,000,000 shares of common stock, no par value.  In addition, the amendment named five members to the board of directors: defendant Adrian Coppieters, Andrea Coppieters, Rosana Texeira, Antonio Texiera and Jeffrey M. Koltun.

12.    On July 31, 2000, Hotel Discounts Network Corp. merged with Network Reservation Center, Inc. ("Network Reservation"), the principal of which was Andrea Coppieters, who, on information and belief, is a relative of Defendant Adrian Coppieters. On the effective date of the merger, each of the outstanding 500 shares of Network Reservation was converted into 4,800 shares of Hotel Discounts Network Corp., for a total of 2,400,000 shares of common stock of Hotel Discounts Network Corp.

13.    On May 3, 2001, Hotel Discounts Network Corp. amended its articles of incorporation to authorize the company to issue 50,000,000 shares of common stock, no par value.

14.    On October 9, 2001, HDN reported that it had secured $1,000,000.00 funding from private investors to finance continued expansion.  Defendant Demakos stated that "[a]lthough a private company our investors are fully committed to our program for planned growth through acquisitions and strategic partnerships."

15.    On October 12, 2001, the Orlando Business Journal reported on the $1,000,000.00 private investment as well as the fact that HDN had recently signed a $10,000,000.00 contract with a Brazilian tour operator.  At that time, defendant Demakos stated that "[o]ur goal, from a revenue standpoint, is $30 million to $40 million in the travel industry and $10 million in consumers."  He stated further, "[i]t's an ambitious

plan, but the firm is off to a strong start.  The communications heart of HDN – its website – has been up and running for only two weeks, but the company already has 35 employees and just moved into a larger facility in Sanford.  Things can only get easier."

16.    In November 2001, HDN issued a press release further touting its services. The release states that in just one month, HDN added more than 1,000 hotels and resorts to its reservation service.  The release further states that HDN is the "fastest growing online hotel reservations service and represents more than 10,000 hotels and resorts worldwide."

17.    By the middle of 2002, was heavily involved in the Brazilian travel market, advertising on Brazilian radio and television.

18.    On June 19, 2002, Hotel Discounts Network announced a name change to Hotel Distribution Network.  In announcing the name change, defendant Demakos stated, "[b]y working together we can help our partners maximize their yield and revenues and still provide consumers with the best prices online – guaranteed.  This policy of partnership clearly sets us apart from the competition and will continue to do so after the launch of our next generation software technology."  Demakos went on to state that the new software "will not only set us apart from the competition, it will put us well ahead of the competition."  The name change was officially effectuated on October 23, 2002 when Hotel Discounts Network Corp. amended its articles of incorporation to authorize the company to issue 200,000,000 shares of common stock, no par value.

### Plaintiff Purchases an Interest in HDN

19.    On or about August 14, 2001, Plaintiff, purchased certain convertible notes from HDN due on August 10, 2002.  The notes were convertible to common stock

at $ .33 per share.  Plaintiff paid a total of $150,000.00 for the notes.  Thereafter, on or about November 6, 2001 and February 15, 2002, Plaintiff purchased additional notes again due on August 10, 2002 and convertible to common stock at $ .33 per share. Plaintiff paid a total of $73,000.00 for these additional notes.  The August 10, 2001 notes, November 6, 2001 notes and the February 15, 2002 notes are collectively referred to herein as the "Notes."

20.     Plaintiff was one of only three (3) initial investors in HDN.  In addition to Plaintiff's investment, investor Douglas J. Nagel invested nearly one million dollars ($1,000,000.00), purchasing convertible promissory notes from HDN.  Defendant Cougentakis also invested in HDN during this time frame.  On information and belief, by the middle of 2002, Cougentakis had purchased approximately 810,000 shares of HDN stock at $1.00 per share.

21.     Pursuant to an Agreement dated June 7, 2002, Plaintiff converted the Notes, which totaled $223,000.00, into a five (5%) percent equity position in HDN.

22.     The June 7, 2002 Agreement included an Anti-Dilution Rider, which stated, in part, that "[a]t no time prior to two years after the execution of the Agreement and satisfactory retirement of the Debts, shall the Equity Percentage of Holder be allowed to be reduced to less than FIVE PERCENT (5%) of the outstanding shares of the Company."

23.     On information and belief, between September 2002 and October 2002, Cougentakis invested an additional $250,000.00 in HDN.

24.    On information and belief, in November 2002, Sabre Holdings of Dallas, Texas offered to purchase HDN for approximately $12,000,000.00.  HDN never advised Plaintiff of this offer.

25.    In February 2003, Defendants Demakos and Coppieters voted to add Defendant Cougentakis as a director of HDN.  Thereafter, pursuant to an "Action" by the Board of Directors of HDN, HDN and Defendants Demakos, Coppieters and Cougentakis, as members of the Board of HDN, requested that Plaintiff agree to rescind and negate the June 7, 2002 Anti-Dilution Rider in exchange for a one time issuance of 2,355,263 shares of common stock of HDN.  Pursuant to this "Action," Defendant Cougentakis also allegedly agreed to the rescission of his anti-dilution agreement in exchange for a one time issuance of 15,000,000 shares of HDN.  Pursuant to the "Action," Defendants Demakos and Coppieters allegedly rescinded anti-dilution clauses in their employment contracts with HDN and exercised certain options in HDN stock.  As such, each received 15,000,000 shares of HDN.

26.    On February 7, 2003, Plaintiff and defendants Demakos, Coppieters and Cougentakis entered into an Agreement to Waive/Rescind and Forever Negate Anti-Dilution Agreement.  (A copy of the Agreement to Waive/Rescind and Forever Negate Anti-Dilution Agreement is attached as Exhibit "1")  This agreement lists the total stock holdings of HDN for defendants Demakos, Coppieters and Cougentakis at 24,075,000 shares each and Plaintiff's HDN holdings at 4,365,082 shares.

27.    On information and belief, in or about February 2003, Defendant Cougentakis held a meeting with Jeffrey and Bradley Tolkin, two travel industry veterans who had expressed an interest in purchasing HDN.

28.     On information and belief, on or about February 10, 2003, HDN prepared and issued a Private Placement Memorandum.  As a result, HDN secured an additional $695,000.00 from twelve (12) investors.

29.     On information and belief, by August 2003 HDN had accumulated a sizeable business in the lucrative Brazilian on-line travel market.  However, HDN and the defendants concealed the profitability and significant success of HDN from Plaintiff.  The purpose of the concealment was to allow the defendants to remove assets from HDN and deceive Plaintiff from the marketability and profitability of HDN.

30.     On information and belief, HDN failed to make principal and interest payments and defaulted on the $695,000.00 in promissory notes held by the 12 investors set forth in paragraph 28.  As a result, at least 11 investors filed suit against HDN.

31.     On or about July 23, 2003, investor Douglas J. Nagel filed suit against HDN, Demakos and Coppieters, claiming that the defendants improperly induced Nagel to convert certain of his promissory notes into shares of stock.  Nagel further alleged that the value of his stock was diluted when Demakos and Coppieters abandoned their fiduciary duties to HDN by acquiring large equity positions in HDN for a fraction of the amount paid by Nagel.  Nagel further alleged that Demakos and Coppieters allowed Cougentakis to purchase shares of HDN at a price much lower than that paid by Nagel.

32.     On information and belief, in and around July 2003, Cougentakis held a meeting with Demakos, Coppieters and Gil Sternbach, an HDN executive.  On information and belief, the purpose of the meeting was to devise a way for Cougentakis to arrange a transfer of HDN's assets by claiming that HDN was or would soon be

bankrupt and, thus, to avoid HDN's obligations to its shareholders, investors and creditors.

33.     On information and belief, Cougentakis agreed to pay Nagel $250,000 to settle his lawsuit while HDN's Sanford, Florida operations were shuttered and Demakos closed down most of HDN's bank accounts.

34.     On information and belief, and around this time, Cougentakis opened a new call center in Florida and transitioned HDN's accounting and financial systems.

35.     In August 2003, HDN provided Defendant Cougentakis with a security interest in all assets owned by HDN in return for alleged investments he had made in the company over a two year period.  Plaintiff Guarino was never informed that HDN provided this security interest to Cougentakis.

36.     In September 2003, HDN allegedly defaulted on its obligations to Cougentakis and he began foreclosure on all HDN assets.

37.     In and around October 2003, barely one month after HDN allegedly defaulted on the Cougentakis security interest, Cougentakis and a second entity Granite Financial Partners, LLC (hereinafter "Granite") formed Rooms.com as an on-line travel company to succeed to the business and technology created by HDN.

38.     In and around January 2004, Defendant Demakos advised Plaintiff that HDN's assets were being foreclosed upon by Cougentakis because of the unprofitability of HDN.  On information and belief Defendant Cougentakis had Defendant Demakis advise Plaintiff that if he would consent to the foreclosure, Plaintiff would receive a five percent (5%) interest in any successor company to HDN.  Based upon the Cougentakis/Demokos statement and inducement, Plaintiff did not oppose the

foreclosure. Demakos failed to advise Plaintiff that, in fact, Cougentakis had already formed Rooms.com as the successor to HDN.

39.    Upon the foreclosure, Plaintiff continued to hold his 4,365,082 shares of HDN. Based on Cougentakis/Demakos representation, those shares would be converted into shares of the successor company.

40.    Unaware of the critical information concealed by the Defendants Demakos, Cougentakis and Coppieters, Plaintiff consented to the Cougentakis foreclosure on all HDN assets and granted peaceful possession thereto. As a result of the foreclosure, possession of HDN assets was transferred as HDN assigned title to its collateral pursuant to a Bill of Sale.

41.    On July 30, 2004, Teleplus Consumer Services Inc. ("Teleplus") announced a letter of intent to acquire a 100% interest in Rooms.com. The press release by Teleplus stated that the deal was subject to the "approval of the stockholders of Rooms." Plaintiff was never advised of the offer to acquire Rooms.com and as a result of Defendants' conduct was never given the opportunity to vote his shares regarding this planned acquisition. On October 6, 2004, Teleplus announced that Rooms.com had terminated the letter of intent in order to pursue other business opportunities. Again, due to Defendant's conduct, Plaintiff was never given the opportunity to vote his shares with respect to the proposed deal.

42.    On information and belief, in and around June 2005, an entity known as World Travel Holdings ("WTH") purchased Rooms.com for $15,000,000.00. WTH is owned by Defendant Cougentakis along with the brothers Jeffrey and Brad Tolkin. On information and belief, financing for the acquisition was provided by Alinian

Capital Group.  Defendant Cougentakis is a principal of Alinian and James Morrell,

another principal of Alinian, sits on the WTH Board.

43.    Throughout 2004 and 2005, Plaintiff stayed in contact with defendant

Demakos in order to keep himself apprised of the status of the successor to HDN.  At no

time did Demakos advise Plaintiff of the incorporation of Rooms.com, of the Teleplus

offer, or of the acquisition by WTH.  Rather, Demakos misrepresented the facts, and

continued to advise Plaintiff that the successor company had not been formed.  On

information and belief, Demakos was acting on instruction from Defendant Cougentakis.

### Defendants' Debt Conversion and Stockholders Agreement
### With Certain HDN Investors

44.    In contrast to the misrepresentations made to Plaintiff, beginning in and

around April 2004, the Defendants did act to provide certain HDN investors with an

interest in Rooms.  For example, on information and belief, in April 2004, Rooms

assumed the indebtedness of HDN to a note holder Douglas J. Nagel ("Nagel") and

issued Nagel five percent (5%) of the then outstanding common stock of Rooms.com.

45.    Further, in November 2004, Rooms offered a debt conversion to certain

other HDN investors whereby their debt investments would be converted to stock in

Rooms.  In a letter dated November 17, 2004, Rooms.com wrote to Jose Rivera who, on

information and belief, was an investor in HDN (the "Rivera Letter").

46.    Significantly and similar to the representations Defendant Demakos made

to Plaintiff, in the Rivera Letter, Rooms.com affirmed previous representations that

investors in HDN would receive stock in Rooms.com, stating:

> "In January 2004, HDN's operating assets were foreclosed
> upon by HDN's major secured creditor [Defendant
> Cougentakis].  In connection with the foreclosure, the

Creditor indicated that when and if it formed a new travel company that employed the assets foreclosed upon as a significant part of its business, such Creditor would act to permit the former HDN investors to participate in the new company. The Creditor subsequently founded Rooms.com, Inc., an online travel company, which survives today. The documents enclosed with this letter identify the amount that each of the Investors invested in HDN, which amounts are intended to accounted for in the capital structure of Rooms."

47.     The Rivera Letter demands that the investor enter into a Release as "consideration for the issuance of common shares to [them] by Rooms."

48.     The Rivera Letter also attached a proposed Debt Conversion and Stockholders Agreement. (A copy of the Debt Conversion and Stockholders Agreement is attached as Exhibit "2.") The Debt Conversion and Stockholders Agreement misrepresent certain facts and, significantly, fails to reference Plaintiff's interest in HDN. Specifically, Paragraph A of the Debt Conversion and Stockholders Agreement states that "[t]he HDN Stockholders were the founders and *sole* stockholders of Hotel Distribution Network Corp., a Florida corporation." (emphasis added). This agreement defines the "HDN Stockholders" as defendants Coppieters and Demakos, yet fails to account for the fact that Plaintiff held 4,365,082 shares of HDN. *See* Exhibit 1. The Debt Conversion and Stockholders Agreement also fails to delineate Defendant Cougentakis' actually position as a director and shareholder of HDN even though Cougentakis was a director of HDN and who, like defendants Coppieters and Demakos held 24,075,000 shares of HDN as of February 7, 2003. The intent of the document is clear – Cougentakis would be relieved of liability under the Release as it applied to Rooms.com's unidentified and unnamed "present or former affiliates" or "stockholders."

49.    The Debt Conversion and Stockholders Agreement gives Cougentakis (as well as Granite – for which Cougentakis is a principal) a disproportionate share of Rooms.com than what would be expected based on the collective investment in HDN.

50.    Cougentakis' interest in HDN was that of a shareholder.  As such, he would be entitled to proceeds from a bankruptcy only after creditors and promissory note holders are paid.

51.    The Debt Conversion and Stockholder Agreement fails to list Plaintiff as a company participant or shareholder.  Plaintiff was not informed of the Debt Conversion and Stockholder Agreement and was not offered the opportunity to participate in the agreement.

52.    In fact, Plaintiff did not know of the existence of Rooms or have any information regarding the actions referenced in the Debt Conversion and Stockholders Agreement until he received a July 2007 letter from an attorney for Jose Rivera, a creditor of HDN.  Plaintiff  was provided with a copy of the Debt Conversion and Stockholders Agreement that was offered to Mr. Rivera.  Upon receipt of this information, Plaintiff again made repeated calls to Defendant Demakos to inquire about his investment in HDN and shares in Rooms, but never received a response.

53.    Plaintiff was never compensated for the fair market value of his shares of HDN in accordance with statutory shareholder appraisal rights.

**DUTIES OF THE INDIVIDUAL DEFENDANTS**

54.    By reason of their positions as officers, Directors and/or fiduciaries of HDN and because of their ability to control the business and corporate affairs of HDN, Defendants Demakos, Coppieters and Cougentakis (the "Individual Defendants") owed

HDN and its shareholders, including Plaintiff, fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage HDN in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of HDN and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest of benefit.

55.    Each Director and officer of the Company owed Plaintiff and other shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the status of HDN, as well as the existence and incorporation of Rooms and any business plan associated therewith.

56.    The Individual Defendants, because of their positions of control and authority as Directors and/or officers of HDN, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial and Directorial positions with HDN, each of the Individual Defendants had access to the information regarding the business of Rooms which was hidden from Plaintiff.

57.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of HDN, and was at all times acting within the course and scope of such agency.

58.    To discharge their duties, the officers and Directors of HDN were required

to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.

59.    Each Individual Defendant, by virtue of his position as a Director and/or officer, owed to Plaintiff, as a shareholder, the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as Directors and officers of HDN, the absence of good faith on their part, and a reckless disregard for their duties to Plaintiff and the other shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

60.    The Individual Defendants breached their duties of loyalty and good faith by allowing causing the Company to misrepresent its financial status and prospects and to misrepresent the fact that a successor company, in the form of defendant Rooms, was a successful and viable company, as detailed herein, and by failing to prevent the Individual Defendants from taking such illegal actions.

**CONSPIRACY, AIDING AND ABETTING,
AND CONCERTED ACTION**

61.    In committing the wrongful acts alleged herein, the Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

62.    During all times relevant hereto, the Defendants collectively and individually initiated a course of conduct that was designed to and did conceal the incorporation, existence and operations of Rooms from Plaintiff, in order to allow Defendants to reap the benefit of Plaintiff's financial investment without having to honor Plaintiff's percentage investment in Rooms.  In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

63.    The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least February 2003 and continuing thereafter.  While Plaintiff did not become aware of this conduct until July 2007, during this time the Defendants caused the Company to conceal the true facts regarding the shuttering of HDN and the incorporation, existence and business of Rooms.  In addition, the Defendants also made other specific, false statements about HDN and Rooms, as alleged herein.

64.    The purpose of and effect of the Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Defendants' violations of law, breaches of fiduciary duty, abuse of control and unjust enrichment; to conceal the incorporation, existence and business of Rooms and to purposely withhold the shares of Rooms rightfully owned by Plaintiff.

65.    Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of

that wrongdoing, and was aware of his overall contributions to and furtherance of the wrongdoing.

## FIRST COUNT
## BREACH OF FIDUCIARY DUTIES

66.    Plaintiff asserts this claim against the Individual Defendants.

67.    Plaintiff re-alleges all of the above allegations as though they were more fully set forth herein at length.

68.    Each Individual Defendant owed fiduciary duties of due care, good faith and loyalty to Plaintiff in connection with its operations, management and direction.

69.    To discharge these duties, the Individual Defendants were required, among other things to:

    (a)    Manage, conduct, supervise and direct the business affairs of HDN in accordance with applicable laws and regulations;

    (b)    Neither violate nor permit any officer, Director, agent or employee of HDN to violate applicable laws or regulations;

    (c)    Provide accurate and truthful information to shareholders regarding the financial status of the company, the status of their investment in the company and the future prospects for the company and its assets, including its technology.

70.    The Individual Defendants breached their fiduciary duties by failing to properly or truthfully represent the financial status of the company, the status of Plaintiff's investment in the company and the future prospects for the company and its assets, including its technology.

71.    The Individual Defendants breached their fiduciary duties of good faith and loyalty owed to Plaintiff by failing in their responsibility to accurately and properly disclose information (including, but not limited to, the formation of Rooms) to Plaintiff.

72.    The Individual Defendants breached their fiduciary duties of good faith and loyalty owed to Plaintiff by misrepresenting the facts associated with the formation of Rooms and the status of Plaintiff's investment and individually failing to maximize profitability and marketability of HDN to the detriment of HDN investors.

73.    Plaintiff has no adequate remedy at law.

## SECOND COUNT
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES

74.    Plaintiff asserts this claim against the Individual Defendants.

75.    Plaintiff re-alleges all of the above allegations as though they were more fully set forth herein at length.

76.    The Individual Defendants breached their fiduciary duties to Plaintiff.

77.    Each Individual Defendant knew that the other Individual Defendants breached their fiduciary duties of good faith and loyalty owed to Plaintiff.

78.    Each Individual Defendant provided substantial assistance to the Individual Defendants' breaches of fiduciary duties to Plaintiff by knowingly assisting and participating in their representations and omissions, and their breaches of fiduciary duty.

79.    As a result of the Individual Defendants' participation in breaches of fiduciary duties of the Individual Defendants, Plaintiff has been damaged in an amount to be proven at trial.

80.    Plaintiff has no adequate remedy at law.

## THIRD COUNT
## UNJUST ENRICHMENT

81.    Plaintiff asserts this claim against all Defendants.

82.    Plaintiff re-alleges all of the above allegations as though they were more fully set forth herein at length.

83.    As a result of the Defendants' wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Plaintiff.

84.    In February 2003, Plaintiff owned 4,365,082 shares of HDN, approximately 17% of the stock amounts owned by defendants Coppieters, Demakos and Cougentakis.  Plaintiff, however, has been defrauded of his right to participate and reap the benefits of ownership in Rooms.com.  Plaintiff was promised a 5% stake in Rooms.com and Defendants failed to abide by this promise.  Plaintiff seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, for their wrongful conduct and fiduciary breaches.

## FOURTH COUNT
## CONVERSION

85.    Plaintiff asserts this claim against all Defendants.

86.    Plaintiff re-alleges all of the above allegations as though they were more fully set forth herein at length.

87.    The acts alleged herein constitute conversion of funds by the Defendants, damaging Plaintiff.

88.    By failing to convert Plaintiff's shares of HDN into equivalent shares of Rooms.com, the Defendants deprived Plaintiff of his shares of Rooms.com and/or possession of monies that belong rightfully to Plaintiff.

89.    Defendants had no authority to deprive Plaintiff of his shares of Rooms and/or of the funds he provided as investment into HDN.

90.     Defendants failed, and still fail, to return to Plaintiff possession and control of the shares rightfully due to Plaintiff and/or the funds due to Plaintiff from his investment.

91.     As a result of the foregoing, Plaintiff has been deprived of the possession, control and enjoyment of his property, and has been damaged in an amount to be determined at trial.

### FIFTH COUNT
### IMPOSITION OF CONSTRUCTIVE TRUST

92.     Plaintiff asserts this claim against all Defendants.

93.     Plaintiff re-alleges all of the above allegations as though they were more fully set forth herein at length.

94.     By reason of the facts alleged herein, Defendants have been unjustly enriched and a constructive trust should be imposed on Defendants' funds.

### SIXTH COUNT
### NEGLIGENT MISREPRESENTATION

95.     Plaintiff asserts this claim against the Defendants.

96.     Plaintiff re-alleges all of the above allegations as though they were more fully set forth herein at length.

97.     Plaintiff was an investor in HDN.  As such, he relied upon the representations made by Defendant Demakos, as an officer and director of HDN, as well as Defendants Coppieters and Cougentakis on behalf of HDN, in waiving the anti-dilution provisions of his agreement with HDN.  Moreover, Plaintiff was induced to agree to the foreclosure on HDN's assets by Cougentakis based on the assurance by

Defendant Demakos through Defendant Cougentakis that Plaintiff would receive a 5%

percent interest in the successor company to HDN.

98.    Defendants Cougentakis and Demakos were aware that Plaintiff relied on

the statements regarding assent to the foreclosure, with respect to the question of the

formation of the HDN's successor company and the percentage share of the new

company that would conferred on Plaintiff.

99.    Plaintiff's reliance on the misrepresentations by Defendants has injured

Plaintiff.

**SEVENTH COUNT**
**FRAUDULENT MISREPRESENTATION**

100.    Plaintiff asserts this claim against the Defendants.

101.    Plaintiff re-alleges all of the above allegations as though they were more

fully set forth herein at length.

102.    Defendants induced Plaintiff to agree to the foreclosure on HDN by

Cougentakis based on the assurance by Defendant Cougentakis, through Defendant

Demakos, as an officer and director of HDN, that Plaintiff would receive his percentage

interest in the successor company to HDN.  Plaintiff relied on statements by the officers

of HDN regarding his ownership interest in HDN and any successor entity.  Defendants

intentionally concealed the fact of the formation, existence and business of Rooms.com in

order to deprive Plaintiff of his rightful ownership interest in Rooms.com.  Defendants

knew that the statements to Plaintiff were false.

103.    Defendants further knew that statements made in the Debt Conversion and

Stockholder Agreement were false with respect to the representation that defendants

Demakos and Coppieters were the "sole stockholders" of Hotel Distribution Network

Corp. and regarding the failure to accurately account for Defendant Cougentakis' interest as a shareholder and director of HDN. (*See* Exhibit "2.")

104.     Plaintiff's reliance on the misrepresentations by Defendants has injured Plaintiff.

**EIGHTH COUNT**
**CONSPIRACY**

105.     Plaintiff asserts this claim against the Defendants.

106.     Plaintiff re-alleges all of the above allegations as though they were more fully set forth herein at length.

107.     Defendants induced Plaintiff to agree to the foreclosure on HDN by Cougentakis based on the representation and assurance by Defendant Cougentakis, through Defendant Demakos, that Plaintiff would receive his percentage interest in the successor company to HDN. Plaintiff relied on statements by the officers of HDN regarding his ownership interest in HDN and any successor entity. Defendants intentionally concealed the fact of the formation, existence and business of Rooms.com in order to deprive Plaintiff of his rightful ownership interest in Rooms.com. Defendants knew that the statements to Plaintiff were false.

108.     The Defendants actions constitute an agreement to defraud Plaintiff of his ownership interest in HDN and Rooms.

109.     Plaintiff's reliance on the misrepresentations by the Defendants has injured Plaintiff.

**NINTH COUNT**
**BREACH OF ORAL CONTRACT**

110.     Plaintiff asserts this claim against the Defendants.

111.    Plaintiff re-alleges all of the above allegations as though they were more fully set forth herein at length.

112.    As of December 2004, Plaintiff was the beneficial owner of 4,365,082 shares of HDN.  In and around December 2003 on behalf of HDN and Defendant Cougentakis, Defendant Demakos offered Plaintiff a 5% share in the successor company to HDN.  The consideration for this offer was Plaintiff's agreement to the foreclosure on HDN's assets by Cougentakis.

113.    Plaintiff lived up to his agreement and did not oppose the foreclosure.  The foreclosure took place in January 2004.  Unbeknownst to Plaintiff, Defendant Cougentakis formed Rooms.com in October 2003 to succeed to the business and technology created by HDN.  Plaintiff was never informed regarding the formation, existence or business of Rooms.com and Plaintiff never received his 5% interest in Rooms.com.

114.    Plaintiff has been damaged by the Defendant's actions.

**TENTH COUNT**
**FRAUDULENT CONCEALMENT**

115.    Plaintiff asserts this claim against the Defendants.

116.    Plaintiff re-alleges all of the above allegations as though they were more fully set forth herein at length.

117.    Plaintiff maintained a fiduciary relationship with the Defendants.

118.    This relationship created in the Defendants a duty to disclose any material facts that would affect Plaintiff's decision regarding the foreclosure by Cougentakis, Plaintiff's shares of HDN and the promise of an interest in the successor to HDN.

119.    The Defendants were in possession of material information that they did not disclose to Plaintiff, including the facts surrounding the formation, existence and business of Rooms.

120.    The Defendants had a duty to disclose these material facts due to the fiduciary relationship between the parties and because the Defendants possessed superior knowledge, not readily available to Plaintiff, and they knew that the Plaintiff was acting on the basis of mistaken knowledge.

121.    Thus, the Individual Defendants misrepresented the facts and Plaintiff relied on such misrepresentations and was damaged thereby.

**ELEVENTH COUNT**
**PROMISSORY ESTOPPEL**

122.    Plaintiff asserts this claim against the Defendants.

123.    Plaintiff re-alleges all of the above allegations as though they were more fully set forth herein at length.

124.    As of December 2004, Plaintiff was the beneficial owner of 4,365,082 shares of HDN.  In and around December 2003, on behalf of HDN and Defendant Cougentakis, Defendant Demakos offered Plaintiff a 5% share in the successor company to HDN.  The consideration for this offer was Plaintiff's agreement to the foreclosure on HDN's assets by Cougentakis

125.    Thus, the Defendants made a clear and unambiguous promise to Plaintiff that if he agreed to the foreclosure, he would receive a five percent interest in the successor company to HDN.  Rooms.com was the successor company to HDN.

126.    It was reasonable and foreseeable that Plaintiff would rely on the promises made to him regarding a share in the successor company.

127.    Plaintiff was injured as a result of his reliance on the promises made.

### TWELFTH COUNT
### FRAUDULENT TRANSFER

128.    Plaintiff asserts this claim against the Defendants.

129.    Plaintiff re-alleges all of the above allegations as though they were more fully set forth herein at length.

130.    Plaintiff is at all times material a shareholder of HDN.  Some or all of HDN's assets were transferred to Cougentakis and/or Rooms.com and/or others with the actual intent to hinder, delay or defraud Plaintiff.

131.    Plaintiff has suffered damages as a result of this fraudulent transfer or transfers.

**WHEREFORE**, Plaintiff prays for relief and judgment as follows:

a.    Determining that Defendants are liable for the violations alleged herein;

b.    Awarding Plaintiff for the wrongful conduct alleged herein, together with interest thereon as allowed by law;

c.    Awarding Plaintiff pre-judgment and post-judgment interest as allowed by law;

d.    Awarding Plaintiff his costs and disbursements incurred in connection with this action, including the costs of investigation and litigation and reasonable attorneys' fee, experts' fees, and other costs;

e.    Granting Plaintiff declaratory, injunctive, and other equitable relief including, *inter alia*, a judgment and order establishing a constructive trust over all monies wrongfully retained by the Defendants from Plaintiff; and

f.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues triable at law.

Dated: December 27, 2007                    **BRODSKY & SMITH, LLC**

By:*s/ Evan J. Smith, Esquire*
Evan J. Smith, Esquire
240 Mineola Boulevard
Mineola, NY 11501
(516) 741-4977
(516) 741-0626 (facsimile)